IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RONALD ROSENBURG,

           Petitioner,                No. CIV S-04-2668 GEB GGH P

    vs.

THOMAS L. CAREY, et al.,

           Respondent.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

I. <u>Introduction</u>

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1997 petitioner was convicted of second degree murder with a firearm enhancement to which he was sentenced to fifteen years to life.  The instant petition challenges the 2002 decision by the Board of Prison Terms (BPT) finding petitioner unsuitable for parole.  This was petitioner's *first* suitability hearing.  After carefully reviewing the record, the court recommends that the petition be denied.

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

        The Antiterrorism and Effective Death Penalty Act (AEDPA)  applies to this petition for habeas corpus which was filed after the AEDPA became effective.  <u>Neelley v. Nagle</u>, 138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 117 S. Ct. 2059 (1997).   The AEDPA

1

"worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

/////

2

1    The state courts need not have cited to federal authority, or even have indicated

2 awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

3 Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

4 contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

5 unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

6 occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

7 established Supreme Court authority reviewed must be a pronouncement on constitutional

8 principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

9 binding only on federal courts.  Early v. Packer, 123 S. Ct. at 366.

10    However, where the state courts have not addressed the constitutional issue in

11 dispute in any reasoned opinion, the federal court will independently review the record in

12 adjudication of that issue.  "Independent review of the record is not de novo review of the

13 constitutional issue, but rather, the only method by which we can determine whether a silent state

14 court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

15 2003).

16    The Solano County Superior was the last court to issue a reasoned decision

17 addressing petitioner's claims but for the claim that he was denied parole pursuant to a no-parole

18 policy.  Respondent's Answer, Exhibit D.  Accordingly, the court "looks through" the summary

19 dispositions of the California Court of Appeal and California Supreme Court to the last reasoned

20 decision, i.e. the opinion of the Superior Court, in determining whether the state courts

21 reasonably applied clearly established Supreme Court authority in denying petitioner's claims but

22 for the claim challenging the no-parole policy.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.

23 2 (9th Cir. 2000) (citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590 (1991)).  As

24 for the no-parole policy claim, the court will independently review the record.

25 /////

26 /////

III. <u>Discussion</u>

This action is proceeding on the original petition filed December 20, 2004. The petition contains four claims which implicate the same claim: the BPT did not have sufficient evidence on which to find petitioner unsuitable for parole.  Also stapled to the petition is what appears to be a copy of the petition filed by petitioner in the California Supreme Court. However, petitioner has whited-out "California Supreme Court" and written in "U.S. District Court Eastern District" in the caption of this petition.  This petition contains the following additional claims: 1) petitioner was entitled to have his release date set pursuant to Cal. Penal Code § 1170.2; 2) the BPT's decision to hold his second suitability hearing in two years violated his right to due process; 3) the BPT improperly characterized his offense as a first rather than a second degree murder; and 4) the BPT has an unconstitutional "no parole policy."   Although respondent has not addressed these claims in the answer, the court will address them below.

     A. <u>Insufficient Evidence</u>

     *Legal Standard*

Although due process does not require the existence of a parole scheme, California has established one.  Not all of the myriad procedures of the parole setting system are pertinent here.  The court sets forth that part of the statutory section that is pertinent:

> (a) In the case of any prisoner sentenced pursuant to any provision of law, other than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board of Prison Terms shall meet with each inmate during the third year of incarceration for the purposes of reviewing the inmate's file, making recommendations, and documenting activities and conduct pertinent to granting or withholding postconviction credit.  One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. The panel shall consist solely of commissioners or deputy commissioners from the Board of Prison Terms.

/////

/////

/////

1    The release date shall be set in a manner that will provide uniform terms for
     offenses of similar gravity and magnitude in respect to their threat to the public,
2    and that will comply with the sentencing rules that the Judicial Council may
     issue and any sentencing information relevant to the setting of parole release
3    dates. The board shall establish criteria for the setting of parole release dates and
     in doing so shall consider the number of victims of the crime for which the
4    prisoner was sentenced and other factors in mitigation or aggravation of the
     crime.

5

6    Cal. Penal Code § 3041.

7            In compliance with the statutory mandate, the Board of Prison Terms issued

8    regulations which guide it in finding prisoners convicted of life offenses with parole eligibility

9    for parole setting.  Cal. Code Regs. tit. 15, § 2402 sets forth the criteria for determining whether

10   an inmate is suitable for parole.  Section 2402(a) provides that regardless of the length of time

11   served, a prisoner shall be found unsuitable for and denied parole if in the judgment of the panel

12   the prisoner will pose an unreasonable risk of danger to society if released from prison.

13           Section 2402(c) sets forth the circumstances tending to show unsuitability.  The

14   court lists those of significance here:

15           (1) Commitment Offense.  The prisoner committed the offense in
             an especially heinous, atrocious or cruel manner.  The factors to be
16           considered include:

17           (A) Multiple victims were attacked, injured or killed in the same or separate
             incidents.
18
             (B) The offense was carried out in a dispassionate and calculated
19           manner, such as an execution-style manner.

20           *****

21           (D) The offense was carried out in a manner which demonstrates an
             exceptionally callous disregard for human suffering.
22
             (E) The motive for the crime is inexplicable or very trivial in
23           relation to the offense.

24           (2) Previous Record of Violence. The prisoner on previous occasions inflicted or
             attempted to inflict serious injury on a victim, particularly if the prisoner
25           demonstrated serious assaultive behavior at an early age.

26   /////

5

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

*****

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

Section 2402(d) sets forth the circumstances tending to indicate suitability:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to the victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for the Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome . . .

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

/////

/////

/////

California's parole scheme gives rise to a cognizable liberty interest in release on parole. <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir. 2003). Only one aspect of that liberty interest is of pertinence here: "In the parole context, the requirements of due process are met if 'some evidence' supports the decision." <u>Id.</u> The evidence underlying the board's decision must have some indicia of reliability. <u>Id.</u>

In <u>Biggs</u>, the Ninth Circuit indicated that a continued reliance on an unchanging factor such as the circumstances of the offense could result in a due process violation. Biggs was serving a sentence of twenty-five years to life following a 1985 first degree murder conviction. In the case before the Ninth Circuit, Biggs challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a model prisoner. 334 F.3d at 913. While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs unsuitable, it upheld three: 1) petitioner's commitment offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy. 334 F.3d at 913.

The Ninth Circuit cautioned the BPT regarding its continued reliance on the gravity of the offense and petitioner's conduct prior to the offense:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest.

334 F.3d at 916.

The Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." 334 F.3d at 917.

1    Biggs is in conformance with the stated goals of California's parole establishment

2   system—that is, the goal is not to release persons who will be a danger to the community if

3   released.  Clearly, when looking at the commitment offense in terms of this goal, one would

4   attempt to use it for its predictive value.  The more violent, thoughtless, and callous the crime,

5   the more likely it could be said that the perpetrator would exhibit those tendencies again.  One

6   who not only killed, but excessively violated society's norms is a person less likely to care about

7   those norms when released.  But, the purpose of prison, aside from punishment, is to determine

8   for parole eligibility purposes when, if ever, these presumptions have been confirmed or

9   rebutted.

10    The California Supreme Court, having once seemingly agreed with the Ninth

11   Circuit, see In re Rosenkrantz, 29 Cal. 4th 616, 683 (2002), stating that in order for the BPT to

12   put weight on the exceptional nature of the crime (murder), the murder had to be "particularly

13   egregious," has now defined that term as simply "that the violence or viciousness of the inmate's

14   crime must be more than *minimally necessary to convict him* of the offense for which he is

15   confined."  In re Dannenberg, 34 Cal. 4th 1061, 1095, 23 Cal. Rptr. 3d 417, 440 (2005).  Of

16   course, as the dissent in Dannenberg pointed out, this standard is completely unreviewable.  34

17   Cal. 4th at 1102, 23 Cal. Rptr. 3d at 446.  The minimal elements of the crime are simply that a

18   person dies at the hands of another with the perpetrator exhibiting the requisite intent.  *Any* fact

19   in addition to this could be one viewed as "more than minimally necessary to convict."  For

20   example, one BPT panel may believe that use of a knife per se causes undue suffering; another

21   may believe use of any weapon where death is not instantaneous, probably the vast majority of

22   murders, exhibits callousness.  A conclusion can easily be reached by those who want to claim

23   that the facts of *any* murder are such that they prove more than those facts minimally necessary

24   for a conviction.

25    There can be no doubt that Dannenberg gives carte blanche to the BPT to issue a

26   mere characterization of the crime to support a denial of parole.  For the due process issue, the

8

question is whether AEDPA insulates this authority from review in habeas corpus.  Clearly,

federal due process is not defined by all the intricacies of state law regardless of whether the state

law gives rise to the protectable liberty interest.

> Although state laws may in certain circumstances create a
> constitutionally protected entitlement to substantive liberty
> interests, see, e.g., Sandin v. Conner, 515 U.S. 472, 483-84, 115
> S.Ct. 2293, 132 L.Ed.2d 418 (1995); Tracy v. Salamack, 572 F.2d
> 393, 396 & n. 9 (2d Cir.1978) (per curiam), state statutes do not
> create federally protected due process entitlements to specific
> state-mandated procedures. "Elevating a state-mandated procedure
> to the status of a constitutionally protected liberty or property
> interest, would make process an end in itself rather than a
> requirement whose constitutional purpose is to protect a
> substantive interest in which the individual has a claim of
> entitlement." Sealed v. Sealed, 332 F.3d 51, 57 n. 5 (2d Cir.2003)
> (quoting Olim, 461 U.S. at 250-51, 103 S.Ct. 1741, and Doe v.
> Milwaukee County, 903 F.2d 499, 503 (7th Cir.1990).

Holcomb v. Lykens, 337 F.3d 217, 224 (2nd Cir. 2003).

All that federal law requires for parole hearing due process is that the inmate up

for parole consideration be given a hearing with minimal rights and that the decision be

supported by "some evidence."  Biggs, supra.  Because the federal due process in parole

suitability hearings arises from a liberty interest created by state law,[1] state courts are generally

free to define their law in connection with the liberty interests as the final arbiters of their state

law.  Thus, in general, if state courts desire to define their state's parole criteria in a restrictive

fashion, the liberty interest is characterized by those restrictive holdings.

However, state courts may not interpret their law in such an arbitrary manner that

the interpretation is nothing but an evasion of the federal due process requirements, minimal as

they may be.  "[W]e are bound by the state's construction [of state laws] except when it appears

that its interpretation is an obvious subterfuge to evade the consideration of a federal issue."

Peltier v. Wright, 15 F.3d 860, 862 (9th Cir.1994); see also Oxborrow v. Eikenberry, 877 F.2d

---

[1] Federal due process does not require that a state have a parole system.  Greenholtz v.
Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2104 (1979).

1395, 1399 (9th Cir.1989) ("Our deference to the [state] Court is suspended only upon a finding

that the court's interpretation [of state law] is untenable or amounts to a subterfuge to avoid

federal review of a constitutional violation.").  The question ultimately to be decided here is

whether the <u>Dannenberg</u> interpretation is so unreviewable, i.e., the facts underlying *any* murder

can stand as "some evidence" to deny parole suitability, that the federal standard of "some

evidence" is, in essence, completely eviscerated.

  The undersigned is mindful that a majority of justices on the California Supreme

Court in <u>Dannenberg</u> (4-3 decision) implicitly answered the question in the affirmative, although

federal due process and liberty interests were not at issue per se in that case.  Therefore, it would,

and should, be rare indeed that a lower court federal judge should find the decision of a state

supreme court to be an unreasonable application of clearly established Supreme Court authority.

The question goes so much further than whether the undersigned believes that the dissent had the

better of the argument.  Even clear error is insufficient.  That having been said, the undersigned

cannot find a justifiable reason to find that the determination was reasonable.

  As it stands now, the law in California permits parole to be denied *solely* on the

basis of the nature of the crime.  "The nature of the prisoner's offense, alone, can constitute a

sufficient basis for denying parole."  <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 682, 128 Cal. Rptr.2d

1104 (2002).  However, the historical facts of the crime will never change, and all prisoners

having been found to have committed a crime with facts "more than minimally necessary to

convict," i.e., nearly everyone, can have their life with parole case effectively transmuted to life

without parole—because the facts of the offense will never change.  Under present California

law, the BPT does not set the sentence, and therefore due process does not permit the BPT to

change the court imposed sentence either *de jure* or *de facto*.

  But, one might argue, a later panel may ultimately assess the unchangeable facts

of the case differently than a previous panel, or two, or three, etc.  This argument, however, gives

no substance to due process notions.  The argument would expressly hinge due process on the

luck of the draw, that is, maybe (but doubtful) a panel will come along that will view the facts as not more than minimally necessary to convict. Compelling due process to hinge on such an arbitrary factor is no due process at all.

One final argument could be made to support the Dannenberg standard. The BPT is not *compelled* to deny parole solely on the basis of the "aggravated" nature of the crime. But this argument does not cure the due process defect either. Simply because some inmates may, at essentially the sole discretion of the BPT, receive a parole eligibility finding despite the existence of an unreviewable and standardless "nature of the crime" factor (and not many inmates have) – does not mean that the factor is therefore constitutional when used to deny parole. The deficiency in the factor is in its standardless, meaningless application per se when used to deny parole suitability. Due process in a particular case is adjudged on an individual, not statistical, basis. In other words, a due process violation against one person is not answered by reference to another person who suffered no ultimate harm as a result of the violation.

Thus, the undersigned must continue to follow Biggs. Repeated application of the severity of the crime factor will violate due process when the crime for which incarceration was required grows more remote. Although the Ninth Circuit in Biggs did not explicitly state when reliance on an unchanging factor would violate due process, it makes sense that reliance on such a factor becomes unconstitutional when the factor no longer has predictive value. The court makes this determination on a case by case basis.[2]

The undersigned must relate that a district judge of this court believes that the California parole scheme for indeterminate sentences does not create a federal liberty interest.

_____

[2] The undersigned must follow Biggs, not simply because the decision makes sense, but because the undersigned is bound to follow it as well. While it might be possible for the undersigned to deviate from Biggs if a higher federal authority had repudiated the case holding directly or in principle, i.e., either the Ninth Circuit en banc, or the Supreme Court, the undersigned does not have that ability to ignore it simply because the California Supreme Court has issued a decision seemingly contrary to one it issued a few years ago. The Ninth Circuit must inform its lower court judges whether it is willing to depart from Biggs.

11

1  Sass v. Cal. Board of Prision Terms, __ F. Supp. 2d __, 2005 WL 1406100 (E.D. Cal. 2005)

2  (Honorable Morrison England).  In Sass, Judge England found that no federal liberty interest was

3  created because the wording of the parole statute, Cal. Penal Code 3041(a) ("a panel *shall*

4  *normally* set a release date..) and § 3041(b) ("the panel...*shall set* a release date....)" was

5  insufficiently mandatory.  Judge England relied heavily on In re Dannenberg, 34 Cal. 4th 1061,

6  1098, 23 Cal. Rptr. 3d 417, 443 (2005) which admittedly, and as previously set forth, vested

7  almost unlimited, unreviewable discretion within the BPT when it came to determining parole

8  eligibility.  However, even assuming that the "old" Supreme Court paradigm regarding creation

9  of a liberty interest (mandatory act and underlying factual predicates) remains the analytical

10  framework in which to judge the creation of right-to-parole liberty interests, see e.g., Board of

11  Pardons v. Allen, 482 U.S. 369, 378, 107 S. Ct. 2415, 2421(1987) (mandatory language in a

12  parole statute creates a "presumption of release" and gives rise to a liberty interest), California

13  law, both before and after Dannenberg finds that the California parole scheme for indeterminate

14  offenses does create a liberty interest.

15  
16  
17  
18  
19  
20  
21  
> In sum, the governing statute provides that the Board *must grant parole* unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen.Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board *must set a parole date* for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. (Cal.Code Regs., tit. 15, § 2401.) Accordingly, parole applicants in this state *have an expectation that they will be granted parole* unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.

22  In re Rosenkrantz,  29 Cal. 4th 616, 654, 128 Cal. Rptr. 2d 104, 138 (2003) (emphasis added).

23  It is difficult to conceive of words which mirror the requirements of the Allen mandatory-act-in

24  light-of-satisfied-factual-predicates paradigm more than the emphasized words of Rosenkrantz.

25  Indeed, Allen and Rosenkrantz use the same terminology, i.e. "presumption" of release and

26  "expectation" of release.  These are the words of liberty interest creation.  It is not material that

1    great discretion is vested within the administrative agency granting parole.  Allen supra.  See also

2    the post-Dannenberg case of In re DeLuna,126 Cal. App. 4th 585, 591, 24 Cal. Rptr. 3d 643, 647

3    (2005):

4             Penal Code section 3041, subdivision (b) requires the Board to "set
         a release date unless it determines that the gravity of the current

5             convicted offense or offenses, or the timing and gravity of current
         or past convicted offense or offenses, is such that consideration of

6             public safety requires a more lengthy period of incarceration for
         this individual, and that a parole date, therefore, cannot be fixed at

7             this meeting."  *This statute creates a conditional liberty interest for
         a prospective parolee.* (Cf. Rosenkrantz, supra, 29 Cal.4th at p.

8             661, 128 Cal.Rptr.2d 104, 59 P.3d 174; McQuillion v. Duncan (9th
         Cir.2002) 306 F.3d 895, 901-902.) (emphasis added)[3]

9

10         The undersigned can only find that California law is in disarray on the subject of

11   liberty interest created by the California parole statutes.  Dannenberg did not overrule

12   Rosencrantz, and implied overrulings are extremely disfavored.  Scheiding v. Gen. Motors, 22

13   Cal. 4th 471, 478, 93 Cal. Rptr. 2d 342, 346 (2000).  Indeed, California cases after Dannenberg

14   continue to find a liberty interest and cite Rosenkrantz.  Therefore, Biggs and McQuillion should

15   not, and cannot, be cast aside based on the ambiguities in California law unless the Ninth Circuit

16   so holds.

17        *Analysis*

18         As stated above, in addition to his claims directly challenging the sufficiency of

19   the evidence on which the BPT found him unsuitable, petitioner is also raising a claim that the

20   BPT improperly characterized his offense as first rather than second degree murder in finding

21   him unsuitable.  This claim is encompassed by the claim alleging insufficient evidence to find

22   him unsuitable.

23   \\\\\

24   ────────────────────

25      [3]  Dannenberg did find that California prisoners had no liberty interest in a *uniform* parole
date, 34 Cal. 4th at 1098 (n.18), 23 Cal. Rptr. 3d at 443 (citing Rosenkrantz); however, this is a
far cry from holding that the parole scheme as a whole does not create a conditional liberty

26   interest.

1    In order to put the BPT's decision in context, the court will describe the

2  circumstances of petitioner's commitment offense:

3           On January 21st, 1994, Inmate Rosenburg surrendered to police
            after a victim Clifton Allbritton had been murdered on the 9600
4           block of Ebes, E-B-E-S, in Oakland, California.  The victim was
            killed at about 11:00 p.m.  Rosenburg told officers at the Oakland
5           Police Department that he had shot the victim. He stated that he
            had been the victim of a robbery of his car at gunpoint the night
6           before.  He stated that a friend let him use his semi-automatic
            handgun for protection.  He put the gun in his waistband and then
7           went to 98th Street to get some beer. As he was standing near the
            corner of 98th, the victim came up on Rosenburg. Rosenburg stated
8           that he saw the victim make a move like he was going for a gun.
            Rosenburg, out of fear, pulled out his gun and shot the victim.  He
9           claimed that he had tried to shoot the victim in the leg. The victim
            died of one gunshot wound to the heart.  Witnesses interviewed by
10          the police indicate that they had seen the victim being chased by
            another man who was armed with a handgun.  As the victim fled,
11          the person in pursuit pulled out a gun and fired, striking the victim.

12  Respondent's Exhibit B, p. 9-10.

13          At the hearing, petitioner told the panel that the shooting was in self defense.

14  Exhibit B, p. 14.  Petitioner told his correctional counselor that the victim came up behind him

15  and shouted, "brake yourself," meaning that petitioner should submit to a robbery.  Id., pp. 11-12.

16  In fear for his safety, petitioner pulled out his gun and shot the victim.  Id., p. 12.  At the hearing,

17  petitioner told the BPT that the person who testified at his trial that they had seen petitioner

18  chasing the victim before he shot him was an accomplice to the attempted robbery.  Id., p. 12.

19  Petitioner told the BPT that someone in the District Attorney's Office told the accomplice to

20  falsely testify that petitioner had chased the victim before he shot him.  Id., p. 13.

21          Petitioner told the BPT that less than 24 hours before he committed the crime, he

22  had been carjacked.  Id., p. 14.  The carjackers took petitioner's driver's license and keys.  Id., p.

23  14.  Petitioner had obtained the gun he used to shoot the victim from a friend after the carjacking.

24  Id., p. 11.  Petitioner was afraid that the carjackers would come to his house because they had his

25  housekeys.  Id., p. 11.  He obtained the gun from a friend to protect his wife and two children in

26  case the carjackers came to his house.  Id., p. 11.  At the time of the shooting, he was being

14

driven home by the friend who had just given him the gun.  Id., p. 58.  The incident with the

victim occurred when the friend dropped petitioner off at a store where he planned to buy beer.

Id., p. 58.

The panel found petitioner unsuitable on the following grounds:

The Panel reviewed all the information received from the public
and relied on the following circumstances in concluding that the
prisoner is not suitable for parole and would pose an unreasonable
risk of danger to society or a threat to public safety if released from
prison at this time.  One, the offense was carried out in an
especially cruel and callous manner.  The offense was carried out
in a dispassionate manner.  The motive for the crime was
inexplicable or very trivial in relationship to the offense that was
committed.  The conclusion is drawn from the Statement of Facts
wherein on January 21st, 1994, the prisoner did surrender himself to
the Oakland Police.  The circumstances surrounding the offense is
that the prisoner shot and killed the victim, Allbritton.  The
prisoner does not have much of a criminal history.  However, he
did have some criminal history.  It does not appear that it was an
escalating kind of criminal conduct.  However, the prisoner did fail
previous grants of probation.  So the prisoner failed to profit from
society's previous attempts to correct his criminality.  And those
attempts included adult probation.  He had no juvenile history.
There's nothing in the prisoner's records to indicate that he had an
unstable social history.  It appears that the prisoner has a stable
social history.  Prior criminality included inflicting corporal injury
on a spouse, vandalism, and battery on a police officer.  That was
reduced to (inaudible) noise or offensive words.  And his sentence
was suspended on that.  And the only other arrest was for petty
theft, (inaudible) offense.  Recent psychiatric report by Dr.
VanCouvering, that's capital V-A-N capital C-O-U-V-E-R-I-N-G,
appears to be a supportive report.  It shows that the prisoner is
making progress, and he's on the right track in terms of his risk of
dangerousness to the community if released from prison.  The
prisoner does have some parole plans.  He appears to have viable
residential plans, although he's wanting to not specifically
(inaudible).  The prisoner lacks realistic employment plans.  He
does not have a job offer–or a specific job offer.  However, the
prisoner does have some marketable skills that could be put to use
upon his release.  The Hearing Panel notes that in response to
Penal Code 3042 notices indicate an opposition to a finding of
suitability.  That there was one from the District Attorney's office
from Alameda County.  We did not use that letter.  (Inaudible) was
not received in a timely manner.  There was one also from the
Oakland Police Department.  And in that letter the department
voiced their opposition to a finding of suitability at this time.  The
Hearing Panel makes  the following findings: The prisoner needs
to continue in his quest to fine-tune his ability to be able to cope

15

with stress in a nondestructive manner.  Until enough progress is
made, the prisoner continues to be unpredictable or a threat to
others.  And certainly we encourage him to continue his self-help
programs in that area.  Nevertheless, there are things that the
prisoner should be commended for.  First and foremost is that the
prisoner has been–since the prisoner has been incarcerated, he has
not received any disciplinaries.  He's been involved in the
vocational/educational programs such as electrical and graphic.  He
also have [sic] a vocation from the vocational education which
indicates that there's some expertise or learning that he received in
the area of computers.  And certainly we want to commend the
prisoner for the letters that he received from staff.  He received
positive accolades from staff, especially in the area of vocation and
work.  He had several letters from supervisors attesting that he is a
very good worker.  However, these positive aspects of his behavior
does not outweigh the factors of unsuitability.  Parole will be
denied for two years.

Exhibit B, pp. 63-66.

The court now considers whether "some evidence" supported the decision by the

BPT.  At the outset the court notes that the BPT relied on several unchanging factors related to

the circumstances of the commitment offense to find petitioner unsuitable.  Because only eight

years had passed since petitioner committed his offense and because this was his first suitability

hearing, the court finds that these factors still had predictive value without regard to petitioner's

post-conviction conduct.  <u>Biggs</u>, <u>supra</u>.  Accordingly, the court must consider whether "some

evidence" supported the panel's finding regarding these factors.

The court also observes that in considering the circumstances of the offense, the

BPT relied on the version of events contained in the probation report which supported a second

degree murder conviction: a witness observed petitioner chasing the victim and then shooting

him.  At the hearing, petitioner testified that he shot the victim in self defense after the victim

tried to rob him.  Petitioner denied chasing the victim.

According to the record, petitioner was found guilty after a court trial.  The trial

court obviously rejected the version of events testified to by petitioner at the hearing.  Had the

trial court adopted petitioner's version of events, petitioner would most likely have been

convicted of manslaughter.  <u>People v. Barton</u>, 12 Cal.4th 186, 200-201 (1995) ("'Unreasonable

self-defense' is a shorthand description of one form of voluntary manslaughter.  It exists when a person harbors an honest, good faith belief in the necessity of using deadly force in self-defense but that belief is objectively unreasonable.") Accordingly, in evaluating the factors related to the circumstances of the commitment offense, the court considers the version of events supporting petitioner's second degree murder conviction.

First, the BPT stated that offense was carried out in a cruel and callous manner and in a dispassionate manner.  In making these findings, the BPT was apparently relying on § 2402(c)(1)(B) (offense carried out in a dispassionate and calculated manner) and § 2402(c)(1)(D) (offense carried out in a manner which demonstrates an exceptionally callous disregard for human suffering).

In In re Smith, 114 Cal. App. 4th 343, 7 Cal. Rptr. 3d 655 (2003), the California Court of Appeal described factors which would characterize § 2402(c)(1)(D), i.e. an offense carried out in a manner demonstrating an exceptionally callous disregard for human suffering: "There is no evidence that Smith acted with cold, calculated dispassion; or that he tormented, terrorized, or injured Garner before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering."  114 Cal. App. 4th at 367, 7 Cal. Rptr. 3d at 673.

According to the version of the offense described by the BPT, petitioner chased the victim then shot him.  These facts do no indicate that petitioner acted with cold, calculated dispassion, that he terrorized the victim or gratuitously increased or prolonged the victim's pain.  For these reasons, the court finds that the BPT's finding that petitioner carried out the offense in a manner that demonstrated an exceptionally callous disregard for human suffering is not supported by some evidence.

The BPT also found that the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.  § 2402(c)(1)(B).  The facts do not indicate that the murder was calculated in any way.  Nothing in record indicates, for example, that

1   petitioner sought the victim out then shot him from point blank range.  For this reason, the court

2   does not find that this factor is supported by some evidence.

3          The panel next found that the motive for the crime was inexplicable or trivial in

4   relation to the offense. § 2402(c)(1)(E).  According to the probation report, a witness saw

5   petitioner chase the victim and then shoot him.  The record contains no explanation as to why

6   petitioner shot the victim as he ran away.  Even if the victim had attempted to rob petitioner, as

7   petitioner claimed, the fact that he was running away from petitioner did not justify this use of

8   force.  Under these circumstances, petitioner's motive for shooting the victim was trivial if not

9   inexplicable in relation to the offense.  Accordingly, the court finds that this factor was supported

10  by some evidence.

11         Moreover, assuming the correctness of the trial court's decision, petitioner has yet

12  to come to grips with the magnitude of his crime.  He still views the events through the prism of

13  a victim—hardly reassuring in terms of his actions if released.

14         The panel next found that petitioner's criminal history made him unsuitable.   In

15  1982 petitioner was convicted of misdemeanor corporal injury on his spouse.  Answer, Exhibit

16  B, p. 19-20.  In 1986 petitioner was convicted of public fighting, a misdemeanor.  Id., p. 20.

17         Section 2402(c)(2) permits the BPT to find a prisoner unsuitable if he has on

18  previous occasions inflicted or attempted to inflict serious injury on a victim.  A misdemeanor

19  conviction for corporal injury on a spouse does not suggest that petitioner inflicted or attempted

20  to inflict serious injury.  The discussion of this conviction at the hearing does not shed light on

21  the facts surrounding this conviction and the injury petitioner inflicted or attempted to inflict.

22  Petitioner's conviction for the misdemeanor public fighting also does not necessarily indicate

23  that petitioner inflicted or attempted to inflict serious injury.  That these convictions were

24  misdemeanors suggests that serious injury was not involved.  For these reasons, the court finds

25  that there was not some evidence to support the BPT's finding that petitioner's criminal record

26  demonstrated unsuitability.  In fact, a lack of any significant history of violent crime tends to

18

1   show suitability. § 2402(d)(6).

2        The BPT also found that petitioner was unsuitable because he needed more

3   therapy.  § 2402(c)(5) (prisoner unsuitable if he has a lengthy history of severe mental problems

4   related to the offense).  In particular, the BPT noted that while the recent psychiatric report was

5   supportive, petitioner "need[ed] to continue in his quest to fine-tune his ability to be able to cope

6   with stress in a non-destructive manner.  Until enough progress is made, the prisoner continues to

7   be unpredictable threat to others."  Respondent's Exhibit B, p. 65.

8        Attached to the traverse is a copy of the psychological report prepared by Dr. Van

9   Couvering.  In the section of the report titled "Assessment of Dangerousness," Dr. Van

10  Couvering states,

11       The inmate has a minimal criminal history.  On May 8, 1982, he was charged with
         misdemeanor Corporal Injury on a Spouse and given court probation.  January 18,
12       1986, he was charged with fighting and given a suspended sentence. The next
         incident was the life crime on January 21, 1994, where he was charged with 2nd
13       Degree Murder with a Firearm.  The records show that while in prison he received
         a chrono clearing him for placement in Administrative Segregation on October
14       1999, however there is no indication he was actually put in administrative
         segregation, and the inmates denies that he ever was.  There is a 128A from 2000.
15       There are no 115s in his 8 years of incarceration.  In the community, he has a low
         number of risk factors. There are no prior convictions for violent crime.  He was
16       in his forties when this incident occurred, and is now at an age where violence is
         less likely.

17       *****

18
         There is no history of opiate or alcohol abuse.  He reports a good family
19       environment.  Weapons would be available if he to return to the community, but
         he would be prohibited from owning one.  He expresses a strong attachment to his
20       wife and child, which would motivate him not to recidivate.  The most significant
         risk factor would be whether he felt he or his family was in physical danger.  It is
21       my professional opinion that the estimated dangerousness, were he to return to the
         community, would be low.
22

23       The BPT also relied on the report prepared by Correctional Counselor McNeil for

24  the hearing.  In this report, Counselor McNeil concluded that "[c]onsidering the commitment

25  offense, prior record and prison adjustment, this writer believes the prisoner would pose a

26  moderate to low degree of threat to the public at this time if released from prison."  Respondent's

1   Exhibit G.  He also found that prior to release, petitioner could benefit from maintaining a

2   disciplinary free record, participating in a work assignment and participating in self-help and

3   therapy programs.  Id.

4              Counselor McNeil described petitioner's post-conviction factors as follows:

5       Rosenburg was received at San Quentin on June 23, 1997 for Reception Center
        processing.  On August 19, 1997, he was transferred to Substance Abuse
6       Treatment Facility (SATF) Level III.  While at SATF, he was placed in the
        Graphic-Arts/Priting Vocation, where he received satisfactory work reports from
7       his supervisors.  He remained disciplinary-free while at SATF until August 1,
        2000, when he received a CDC 115 for Being in an Unauthorized Area.  This
8       CDC 115 was subsequently reduced to a CDC 128-A.  On October 4, 1999,
        Inmate Rosenburg's custody was reduced from Close B to Medium A custody.  At
9       his Annual Review on September 3, 1999, Rosenburg was transferred to CSP-
        SOL, Level III.  After his Initial Classification, he was subsequently placed in the
10      Electrical Vocational Trade receiving above average to exceptional work reports
        from his supervisors.  At his Annual Review on August 1, 2000, he was referred
11      to the CSR.  Due to his Classification Score being reduced to Level II, he was
        subsequently transferred to CSP-SOL-II.  On July 20, 2000, Rosenburg appeared
12      before the Board of Prison Terms (BPT) for a Documentation Hearing.  At this
        time, the Deputy Commissioner recommended that he participate in self-help
13      groups and remain disciplinary-free.  On November 3, 2000, Rosenburg began his
        assignment as Porter in Building # 13, receiving satisfactory work reports from his
14      supervisors during this time.  He has remained disciplinary free while on Level II
        and received a certificate for his participation in a Human Development Seminar
15      0n February 7, 2001 (see attached Post Conviction Progress Report for details).

16  Id.

17              Counselor McNeil concluded that petitioner would pose a low to moderate risk of

18  dangerousness if released and that he would benefit from participation in therapy programs.  In

19  contrast, Dr. Van Couvering found that petitioner would post a low degree risk of dangerousness

20  if released and did not find that petitioner required additional therapy.  Dr. Van Couvering is a

21  trained mental health professional.  Therefore, as to the issue of whether petitioner required

22  additional therapy, Dr. Van Couvering's opinion carried more weight than that of Counselor

23  McNeil.  In any event, neither Dr. Van Couvering nor Counselor McNeil found that petitioner

24  had a lengthy history of severe mental problems related to the offense.  While Counselor McNeil

25  stated that petitioner would benefit from therapy, he did not find that petitioner needed therapy.

26  Accordingly, the panel's finding that petitioner required additional therapy was not supported by

1   some evidence.

2         With respect to other factors demonstrating unsuitability, the BPT found that

3   nothing in petitioner's record indicated that he had an unstable social history. § 2402(c)(3)

4   (unstable social history tends to show unsuitability); Respondent's Exhibit B, p. 64.  The BPT

5   found that petitioner had parole plans.  <u>Id.</u>, p. 64.  While petitioner did not have a job offer, he

6   had marketable skills that could be used on his release.  <u>Id.</u>, p. 64.  Based on these comments, the

7   court does not find that the BPT found petitioner unsuitable because he did not have an

8   understanding and plan for his future. § 2402(d)(9).

9         In conclusion, because the BPT's finding that the motive for the crime was

10  inexplicable or trivial was supported by sufficient evidence, the court finds that there was some

11  evidence to support the decision finding petitioner unsuitable for parole.  Because the denial of

12  this claim by the Solano County Superior Court was not an unreasonable application of clearly

13  established Supreme Court authority, this claim should be denied.

14        B.  <u>No-Parole Policy</u>

15        Petitioner contends that he was denied parole pursuant to a no-parole policy.

16  Because the BPT's decision finding him unsuitable was supported by some evidence, whether

17  petitioner was denied parole pursuant to a no-parole policy is not material.  In other words, even

18  if petitioner were found unsuitable pursuant to such a policy, the decision of the BPT would still

19  be upheld because some evidence supported its decision.

20        After independently reviewing the record, the court finds that the denial of this

21  claim by the California courts was not an unreasonable application of clearly established

22  Supreme Court authority.  Accordingly, this claim should be denied.

23        C.  <u>Cal. Penal Code § 1170</u>

24        Petitioner appears to contend that Cal. Penal Code § 1170.2 requires the BPT to

25  establish his release date, which it has not done.  Petitioner also appears to contend that Cal.

26  Penal Code § 3041 also requires the BPT to set a release date.

1    Prior to July 1, 1977, California operated under a indeterminate sentencing law

2   (ISL) system.  Guzman v. Morris, 644 F.2d 1295, 1296 (9th Cir. 1981).  On July 1, 1977,

3   California's Determinate Sentencing Law (DSL) went into effect.  Id.  As part of the conversion

4   from the ISL to DSL, certain indeterminate sentences were to be "reset."  Id.  The provisions of

5   Cal. Penal Code § 1170.2 apply to the resetting of sentences imposed for felonies committed

6   prior to July 1, 1977.  The DSL contains some provisions for indeterminate sentences.  See In re

7   Dannenberg, 34 Cal. 4th 1061, 1078, 23 Cal. Rptr. 3d 417 (2005).

8    Petitioner's commitment offense and sentence occurred after July 1, 1977, under

9   indeterminate sentencing provisions of the determinate sentencing law.  Petitioner's life sentence

10   is an indeterminate sentence.  See Danneberg, at 1078, 23 Cal. Rptr. 3d 417.  As such, petitioner

11   "becomes eligible for parole after serving [a] minimum term [] of confinement," but the

12   determination of his actual term of confinement rests with the Board of Prison Terms.  Id.

13   Petitioner's contention that, absent notice and hearing, he was entitled to release on a date set

14   pursuant to the provisions of Cal. Penal Code § 1170.2 is without merit; that section has no

15   application to petitioner.

16    Petitioner is correct that his eligibility for parole is governed by the provisions of

17   Cal. Penal Code § 3041.  This section provides,

18    (a) In the case of any prisoner sentenced pursuant to any provision of law, other
than Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2, the Board

19   of Prison Terms shall meet with each inmate during the third year of
incarceration for the purposes of reviewing the inmate's file, making

20   recommendations, and documenting activities and conduct pertinent to granting
or withholding postconviction credit.  One year prior to the inmate's minimum

21   eligible parole release date a panel consisting of at least two commissioners of
the Board of Prison Terms shall again meet with the inmate and shall normally

22   set a parole release date as provided in Section 3041.5. The panel shall consist
solely of commissioners or deputy commissioners from the Board of Prison

23   Terms.

24    The release date shall be set in a manner that will provide uniform terms for
offenses of similar gravity and magnitude in respect to their threat to the public,

25   and that will comply with the sentencing rules that the Judicial Council may
issue and any sentencing information relevant to the setting of parole release

26   dates. The board shall establish criteria for the setting of parole release dates and

in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime.

Cal. Penal Code § 3041.

In compliance with the statutory mandate, the Board of Prison Terms issued regulations which guide it in finding prisoners convicted of life offenses with parole eligibility for parole setting.  See  Cal. Code Regs. tit. 15, § 2402.

Section 3041 requires the BPT to find a prisoner eligible for parole if the prisoner meets the criteria set forth in the established regulations.  As discussed above, applying the criteria set forth in § 2402, the BPT found petitioner unsuitable for parole, and this decision was supported by some evidence.  Petitioner's claim challenging application of § 3041 fails for that reason.

The denial of this claim by the Solano County Superior Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

D.  Delay of Second Suitability Hearing

Petitioner contends that the decision by the BPT following the 2002 hearing to hold his next suitability hearing in two years was "excessive."

In California Dept. of Corrections v. Morales, 514 U.S. 499, 115 S. Ct. 1597 (1995), the Supreme Court held that California's retrospective increase in the time between parole hearings for serious offenders did not violate the Ex Post Facto clause.  Therefore, petitioner's claim is foreclosed by Morales.  The denial of this claim by the Solano County Superior Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

Conclusion

In the petition and traverse, petitioner suggests that his failure to obtain a release date violates his plea agreement.  According to the record, petitioner was found guilty of murder

23

1  after a trial.  Therefore, the basis of petitioner's claim for violation of a plea agreement is unclear.

2  In any event, petitioner was convicted in Alameda County which is located in the jurisdiction of

3  the United States District Court for the Northern District of California.

4        While both this Court and the United States District Court in the district where

5  petitioner was convicted have jurisdiction, see Braden v. 30th Judicial Circuit Court, 410 U.S.

6  484 (1973), any and all witnesses and evidence necessary for the resolution of petitioner's claim

7  alleging breach of his plea agreement are more readily available in Alameda County.  Id. at 499

8  n.15; 28 U.S.C. § 2241(d).  Therefore, petitioner's claim alleging violation of his plea agreement

9  should be raised in a habeas corpus petition filed in the United States District Court for the

10  Northern District of California.  However, because it is not entirely clear that petitioner intends to

11  raise such a claim, the court will not order this action transferred to the Northern District for

12  adjudication of the breach of plea claim.

13        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

14  a writ of habeas corpus be denied.

15        These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

17  days after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20  shall be served and filed within ten days after service of the objections.  The parties are advised

21  that failure to file objections within the specified time may waive the right to appeal the District

22  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23  DATED: 8/10/05

24                             /s/ Gregory G. Hollows

25                             GREGORY G. HOLLOWS
                           UNITED STATES MAGISTRATE JUDGE

26  ggh:kj
    ros2668.157